IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2017

## IN RE AARALYN O., ET AL.

**Appeal from the Juvenile Court for Tipton County**
**No. 16-JV-243        William A. Peeler, Judge**

_____

### No. W2017-01411-COA-R3-PT

_____

The trial court terminated Father's parental rights on the grounds of (1) abandonment by failure to establish a suitable home; (2) abandonment by demonstrating a wanton disregard for the children's welfare; (3) substantial non-compliance with the permanency plans; and (4) persistent conditions. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Frank Deslauriers, Covington, Tennessee, for the appellant, Anthony O.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Michael H. Willis, Covington, Tennessee, Guardian ad Litem.

### OPINION

### FACTS

Anthony O. ("Father") is the natural and legal parent of three minor children.[1] At the time of the termination hearing, the children were four, three, and one.[2] The

_____

[1] In cases originating from juvenile court, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The children have a younger sibling who is the subject of a separate termination proceeding and appeal.

children's mother, Chelsea S. ("Mother"), surrendered her parental rights to the children before the trial court on November 11, 2016. This case arises solely from Father's appeal of the termination of his parental rights.

On August 26, 2015, the Tennessee Department of Children's Services ("DCS") received a report regarding the minor children. Specifically, law enforcement received an emergency call from Mother and Father's address; the call was dropped prior to completion. Officers then responded to the emergency call at the family's home, finding both Mother and Father under the influence with all three children present. When the DCS investigator arrived on the scene, Father submitted to a urine drug screen, testing positive for methamphetamine, Ecstasy, and amphetamine. Father also admitted to using drugs earlier that day. Additionally, officers recovered drug paraphernalia from the home, including a syringe with an open needle. Numerous other hazards were also observed in the home, for example: large holes in both the floor and the wall covered with plywood and clothing and soiled diapers covering the bedroom floor.

As a result, the minor children were placed in DCS custody on August 27, 2015, and have remained continuously in foster care since that time. The Tipton County Juvenile Court ("juvenile court" or "trial court") entered a written order on January 6, 2016, adjudicating the children dependent and neglected and ordering that the children remain in state custody pending a further order of the court.

DCS prepared three permanency plans in this case. The first permanency plan was developed on September 21, 2015, with the goal of "Return to Parent" or "Exit Custody with Relative[.]" This permanency plan required Father to: (1) contact DCS and schedule visits with the minor children; (2) transport himself and be on time to these meetings, and additionally notify the case manager twenty-four hours prior to the scheduled visit if there was a need to cancel; (3) interact with the child in an age appropriate manner; (4) demonstrate an ability to maintain financial security, appropriate housing, and sobriety; (5) submit to random drug screens; (6) complete an alcohol and drug ("A&D") and mental health assessment and follow the recommendations of these assessments; (7) take medications as prescribed; (8) refrain from being charged with any new offenses and follow all court orders regarding previous criminal charges; (9) complete parenting classes and demonstrate appropriate parenting skills; and (10) complete anger management classes. Father participated in the creation of the permanency plan. The trial court ratified the plan on December 6, 2015.

Two subsequent permanency plans were developed on February 25, 2016, and July 25, 2016. The February 25 permanency plan was ratified on April 20, 2016. Father participated in the February 25 permanency plan by phone. However, at the ratification hearing on April 25, the trial court found that Father was non-compliant with the tasks and responsibilities set forth in the plan. The children therefore remained in foster care.

The July 25 permanency plan was ratified on September 14, 2016. The responsibilities and requirements set forth in this plan did not change from the previous plans. Father did not participate in the development of this plan. However, Bridget Norfork ("Ms. Norfork"), the DCS Family Services Worker, to Father's case, testified that she discussed the plan with Father while he was incarcerated. At the ratification hearing on September 14, the trial court again found Father non-compliant with the tasks and responsibilities set forth in the plan. The trial court, again, ordered that the children remain in foster care.

On November 17, 2016, DCS filed a petition to terminate Father's parental rights. The petition alleged as grounds: (1) abandonment by failure to establish a suitable home; (2) abandonment by an incarcerated parent for failure to visit and support and by demonstrating a wanton disregard for children's welfare; (3) substantial non-compliance with the permanency plans; and (4) persistent conditions. The trial court held a hearing regarding the petition for termination on May 11, 2017. At the start of the hearing, DCS indicated that it would not proceed as to abandonment by willful failure to visit and support. At the hearing, the trial court heard testimony, most notably from Father, Ms. Norfork, and the children's foster mother, Delynn J. ("Foster Mother"). During his testimony, Father acknowledged his lengthy criminal history. Father admitted that in 2009, he was convicted of Grand Theft Auto in Florida, where he served twenty-two months for the crime. Further, Father testified that he was charged with, and pled guilty to, the intentional sale of a controlled substance in 2012. Father also admitted that he had violated probation at least four or five times in total. At the time the children were removed, it appears that Father was on probation.

Additionally, Father affirmed that his criminal behavior continued even after his children were in the custody of DCS. In September 2015, just one month after the children were placed in state custody, Father admitted that he was charged with vandalism. As a result, Father was found to have violated his probation and in March 2016 was sentenced to five years incarceration at thirty percent. Father also testified that with good time credits, his expected release date is January 2018.[3] However, Father admitted that his history of incarceration had led him to spend significant time away from his children.

Moreover, Father conceded that (1) he had not had stable housing at any point since the children were placed into DCS custody; (2) he failed to make any changes in his lifestyle until September 2016, which was over one year after the children were in state custody and after he was incarcerated; (3) he has not visited his children since January 2016, two months prior to his current incarceration; and (4) from August 2015 to

---

[3] Although the record is not clear that Father's release on this date is guaranteed, it generally was not disputed by DCS.

December 2015, the four months following the children's removal, Father failed to remain in consistent contact with DCS or his attorney.

When asked about the permanency plans, Father testified that he had not obtained stable housing, but after his release from jail he believed he would be able to provide stable housing by March 2018. Additionally, Father stated that he did submit to random drug screens, however, he did not always test clean. Further, Father admitted that he did not refrain from illegal activities, as he is currently incarcerated due to revocation of his probation stemming from a vandalism charge. While Father also stated that he did complete a mental health assessment, he admitted that he did not follow the recommendations as he did not complete the recommended alcohol and drug treatment due to an incident with a staff member at the treatment facility. Lastly, Father conceded that although he had completed parenting classes, he did not do so until after he was incarcerated—over one year after his children were removed. Father also acknowledged that he was provided on more than one occasion, and understood, the information regarding the criteria and grounds for the termination of his parental rights.

Ms. Norfork also testified at the May 11 hearing. She stated that the four months immediately following the removal of the children, Father did not have stable housing, never providing DCS with a permanent address, and at times reporting that he was living in his truck. Additionally, Ms. Norfork noted that there were some occasions in which DCS did not know Father's whereabouts. Regardless, Ms. Norfork explained that DCS made reasonable efforts to assist Father in finding a stable home. For example, Ms. Norfork testified that DCS attempted to ascertain Father's whereabouts and provided him with locations for A&D assessments. Ms. Norfork also confirmed that Father was discharged from a rehabilitation center without completing his treatment. Ms. Norfork noted that DCS did not change the requirements in the permanency plans, but extended some achievement dates due to Father's non-compliance. Ms. Norfork also confirmed Father's testimony regarding compliance with the permanency plans.

Ms. Norfork further testified that the children were placed in a pre-adoptive foster home and had been there for the last ten months. Ms. Norfork stated that she had observed the children to be bonded with the foster family and in her opinion it would be detrimental to remove the children from their current placement.

Lastly, Foster Mother testified that the children had bonded with her family, including the family's four biological children still living in the home. Further, Foster Mother testified that the children call her "Mom" and her husband "Dad" and refer to Father only as "Daddy Tony." Foster Mother also states that none of the children ask to see Father; in fact, one child expresses apprehension about the possibility of having to return to Father's home. According to Foster Mother, the children had progressed since being placed in her home. Foster Mother also opined that termination would be in the

best interest of the children and that it would be devastating for her family if the children were removed.

Ultimately, the trial court found each witness credible, including Father as he "d[id] not deny the facts of the Petition, merely the legal conclusions." The trial court also found that based on the evidence presented, there was clear and convincing evidence that (1) Father abandoned minor children pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i); (2) Father did not substantially comply with the permanency plans pursuant to Tennessee Code Annotated sections 36-1-113(g)(2) and 37-2-403(a)(2); (3) "the conditions which led to the removal of the children from the home of the Father still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect[;]" (4) the children are currently placed in a home that will likely adopt them; and (5) it is in the children's best interest that Father's parental rights be terminated.

Therefore, the trial court issued a written order on May 16, 2017, terminating Father's parental rights and awarding full guardianship to DCS. From this order, Father appeals.

ISSUES PRESENTED

Father presents only one issue in his brief, which we have slightly reworded and separated into two issues for clarity, as follows:

1. Whether the trial court erred in finding that DCS proved by clear and convincing evidence that grounds existed for the termination of Father's parental rights.
2. Whether the trial court erred in finding that termination was in the minor children's best interest.

STANDARD OF REVIEW

As explained by the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty

- 5 -

to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." **Hawk**, 855 S.W.2d at 580 (quoting **In re Hamilton**, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* **Santosky v. Kramer**, 455 U.S. 745, 747 (1982); **In re Angela E.**, 303 S.W.3d at 250.

**In re Carrington H.**, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." **In re Jacobe M.J.**, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); **In re D.L.B.**, 118 S.W.3d 360, 367 (Tenn. 2003); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. **Santosky**, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); **In re Valentine**, 79 S.W.3d at 546. As opined by the Tennessee Supreme Court:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. **In re M.L.P.**, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting **In re Adoption of A.M.H.**, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. **In re Angela E.**, 303 S.W.3d at 246.

**In re Carrington H.**, 2016 WL 819593, at *12.

DISCUSSION

**Grounds for Termination**

In this case, the trial court found several grounds for termination: (1) Father abandoned children by failing to establish a suitable home pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i); (2) Father abandoned the children by demonstrating a wanton disregard for their welfare pursuant to Tennessee

Code Annotated section 36-1-113(g)(1); (3) Father did not substantially comply with the permanency plans pursuant to Tennessee Code Annotated sections 36-1-113(g)(2) and 37-2-403(a)(2); and (4) conditions persisted which led to the removal of the children from the home of Father making it unlikely that children would be returned to Father in the near future pursuant to Tennessee Code Annotated section 36-1-113(g)(3).[4]  It appears to this Court that Father is only disputing the trial court's findings of substantial non-compliance with the permanency plan and persistent conditions; however, we will consider each ground.  *See* ***In re Carrington H.***, 483 S.W.3d 507, 525–26 (Tenn. 2016) (ruling that intermediate appellate courts must consider all grounds found by the trial court "regardless of whether the parent challenges these findings on appeal").

<u>Abandonment by Failure to Establish a Suitable Home</u>

According to Tennessee Code Annotated section 36-1-102, abandonment on this ground may be established with proof that:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date

Tenn. Code Ann. § 36-1-102(1)(a)(ii).  Providing a suitable home "'requires more than [providing] a proper physical living location.'"  ***In re Navada N.***, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting ***In re Hannah H.***, No. E2013-01211-COA-R3-PT, 2014 WL 2587393, at *9 (Tenn. Ct. App. June 10, 2014)).  It also requires that the home be "'free of drugs and domestic violence.'"  ***In re Hannah H.***, 2014 WL 258, at *9 (quoting

---

[4] In its petition to terminate parental rights, DCS also alleged the grounds of willful failure to support and willful failure to visit.  However, at trial, it seems that DCS abandoned these two grounds, arguing only the four grounds listed above.

***State v. C.W.,*** No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)).

Although all grounds for termination do not require a showing of reasonable efforts by DCS, failing to provide a suitable home expressly requires that DCS show reasonable efforts to assist parents in reaching this goal. *See* Tenn. Code Ann. § 36-1-102(1)(a)(ii) ("[F]or a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child"); *see generally **In re Kaliyah S.***, 455 S.W.3d 533 (Tenn. 2015). Therefore, DCS must first show that reasonable efforts were made for termination under this ground. ***In re Jasmine B.***, No. M2016-00464-COA-R3-PT, 2016 WL 5345339, at *4 (Tenn. Ct. App. Sept. 22, 2016).

Efforts by DCS, however, "do not need to be 'Herculean.'" ***In re Isobel V.O.***, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. 2012) (quoting ***In re C.M.M.***, No. M2003-01122-COA-R3-JV, 2002 WL 225891, at *7 (Tenn. Ct. App. Mar. 9, 2004)). Indeed, according to section 36-1-102(a)(1)(ii), efforts by DCS to "assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parents or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department." Tenn. Code Ann. § 36-1-102(a)(1)(ii). Thus, DCS must use its "superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." ***Id.*** Additionally, as stated above, this Court is limited to considering DCS's reasonable efforts for a period of four months immediately following the children's removal from the home. *See* Tenn. Code Ann. § 36-1-102(1)(a)(ii). The relevant statutory period in this case is August 27, 2015 to December 26, 2015.

Here, the children were removed from Father's home on August 27, 2015. After the children's removal, and for the four months following, Ms. Norfork tried to maintain contact and communication with Father, developed permanency plans with him, arranged visits with the children, and explained to Father the responsibilities and actions he needed to take in order to regain custody of his children. Ms. Norfork also provided Father with information regarding where he could complete both his A&D and mental health assessments, which were required under the permanency plan.

Ms. Norfork also testified that Father never provided DCS with a permanent address during the relevant period. Thus, Ms. Norfork stated that it was difficult to reach Father to provide help in establishing a suitable home. In evaluating the reasonable efforts of DCS with regard to this ground, we have previously considered the parent's failure to maintain contact with DCS, thereby thwarting DCS efforts to reach out to the parent. *See **In re Candace J.***, No. M2015-01406-COA-R3-PT, 2016 WL 944268, at *9 (Tenn. Ct. App. Mar. 11, 2016) (holding that reasonable efforts were expended by DCS

even though DCS's efforts were somewhat minimized by the fact that the parent failed to provide contact information to DCS).

In contrast, Father made little to no attempt to find a suitable home during this time period. Indeed, Father also conceded that he did not provide stable or suitable housing during this time, even testifying that he was "more or less a transient." Under these circumstances, DCS's efforts in assisting Father in establishing a suitable home for the children far exceeded Father's efforts in attempting to do the same. Therefore, we conclude that DCS made reasonable efforts in assisting Father in reaching this goal in the four months following the removal of the children.

Likewise we conclude that Father failed to provide a suitable home for children at any point following the children's removal and it appears unlikely that he will be able to provide such home for the children at an early date. First, by his own admission, Father conceded that he did not establish a suitable home for his children from August to December 2015. This fact was further corroborated by Ms. Norfork's testimony that Father never provided DCS with a permanent address and that he was even living out of his truck for a period. Additionally, the children were removed from Mother and Father's home due to drug use, drug paraphernalia found in the home, and environmental neglect. Father also conceded that he did fail some drug tests and continued to use drugs until he was incarcerated in March 2016. Thus, Father provided neither a stable physical location as housing, nor a home that would have been free of drugs. Finally, we note that even though Father testified that he would be able to provide a suitable home following his release from incarceration, there can be no dispute that at the time of trial, Father remained incarcerated and unable to parent his children. Thus, by the time of trial, the evidence showed that Father had been either unable or unwilling to maintain a safe and stable home to which the children could return.

Accordingly, DCS has proven by clear and convincing evidence that Father did not provide suitable housing for his children from August 27, 2015 to December 26, 2015, and that it is not likely that Father will be able to provide a suitable home for the children at an early date pursuant to Tennessee Code Annotated section 36-1-102. This ground for termination is affirmed.

<u>Abandonment by an Incarcerated Parent for Wanton Disregard</u>

According to Tennessee Code Annotated section 36-1-102(1)(A)(iv), abandonment has occurred, *inter alia,* when a

> parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding . . .

[and] has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).  However, "incarceration alone [is not] a ground from the termination of parental rights.  An incarcerated or recently incarcerated parent can be found [to have committed] abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." ***In re Audrey S.***, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).  The statutory language balances the notion that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" yet, "incarceration alone in not an infallible predictor of parental unfitness."  ***Id.*** Therefore, a parent's incarceration acts as a "triggering mechanism" that allows the court to examine more closely the child's situation "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child."  ***Id.*** As such, many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." ***In re Navada N.***, 498 S.W.3d 579, 602 (Tenn. Ct. App. 2016); *see, e.g.,* ***State v. J.M.F.***, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); ***In re C. LaC.***, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); ***State v. Wiley***, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); ***In the Matter of Shipley***, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997).  Further, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child.  ***In re Audrey S.***, 182 S.W.3d at 867–68.  Additionally, the court may consider a parent's behavior prior to the four months immediately preceding incarceration in finding behavior that exhibited wanton disregard for the child.  *See **Id.*** at 871.

Turning to the trial court's order, the trial court found that there was clear and convincing evidence that Father had abandoned his children based on behavior that demonstrated a wanton disregard for their welfare.  We agree.  As a preliminary matter, it is undisputed that Father was incarcerated beginning in March 2016, and was still incarcerated at the time of the termination proceeding in May 2017.  Thus, this ground is clearly applicable. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (applying when the parent is incarcerated at or near the filing of the termination petition).

Father's history of criminal behavior began well before the birth of the children[5] but did not abate after their births. In August 2012, Father entered a guilty plea to

---

[5] In 2009, Father was convicted of Grand Theft Auto in Florida, serving twenty-two months in prison.

- 10 -

manufacturing, delivering, and/or selling a controlled substance. Father also pled guilty to numerous driving on a revoked, suspended, or cancelled license offenses in 2013 and has at least four or five probation violations. Moreover, Father's criminal behavior has continued even after the removal of his children in August 2015. Just one month after the children's removal, in September 2015, Father was charged with vandalism and in March 2016, convicted of violating his probation. Indeed, Father had been incarcerated for over a year at the time of trial, with an anticipated release in January 2018.

Father has also chosen to abuse drugs both prior to and after the removal of the children. First, it is undisputed that the children were removed from him and placed in DCS custody for drug-related issues. The day the children were removed, Father submitted to a drug screening at his home and tested positive for methamphetamine, Ecstasy, and amphetamine. Father admitted to using the drugs earlier that day. Additionally, in a search of the home, officers found drug paraphernalia, which included a syringe with an open needle. Father also failed drug screenings after the children were removed, and admitted to consistent drug abuse until he was incarcerated in March 2016.

The trial court succinctly concluded that "Father has a history of violations of probation, criminal behavior, and habitual drug use . . . . That the Father acknowledges his criminal conduct, including Grand Theft Auto, Manufacture/delivery/sell [of] controlled substance, driving on a revoked/suspended/cancelled license, and numerous Violations of Probation."[6] Further, the trial court stated "Father's continued criminal behavior, even after the removal of the children, demonstrates a wanton disregard for the welfare of the children." Therefore, we conclude that DCS presented sufficient evidence of Father's previous criminal conduct, which includes probation violations and repeated incarcerations, and a history of drug abuse, constituting behavior that exhibits a wanton disregard for the welfare of his children. This ground is therefore affirmed.

## Substantial Noncompliance with Permanency Plans

---

[6] We note that the trial court improperly relied upon Father's conviction for Grand Theft Auto, which conviction occurred well before the birth of any of the children at issue. *See In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at \*12 (Tenn. Ct. App. June 6, 2017) (citing ***In re Anthony R.***, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at \*3 (Tenn. Ct. App. June 9, 2015) ("Logically, a person cannot disregard or display indifference about someone whom he does not know exists.")) (holding that father's criminal activity that occurred prior to the father's knowledge of the conception of the child was insufficient to support this ground). There can be no dispute, however, that Father continued to engage in criminal activity and drug use following the births of all the children at issue in this case. Specifically, the oldest child had been born when Father was convicted of a drug crime in 2012, and all of the children at issue had been born when Father was charged with vandalism, leading to the violation of his probation. Likewise, Father's drug use continued apparently unabated even after these children were removed from his custody. As such, we conclude that clear and convincing evidence supports the ground of wanton disregard, notwithstanding the trial court's reference to Father's criminal conduct that occurred even before the birth of the oldest child.

We next consider the trial court's finding that Father failed to substantially comply with the permanency plans. The ground for substantial noncompliance is outlined in Tennessee Code Annotated section 36-1-113(g)(4), which states that grounds for termination exists where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" *In re Navada N.*, 498 S.W.3d at 603; Tenn. Code Ann. 36-1-113(g)(4). Accordingly, Tennessee Code Annotated section 37-3-4 provides, in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

Tenn. Code Ann. 37-3-403. In other words, to succeed under the statute, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)).

Turning to the case at hand, DCS prepared three permanency plans. The trial court found each of the permanency plans to be reasonable, necessary, and in the children's best interest, as evidenced by each of the ratification orders and the final termination order. The requirements of the permanency plans are as follows: (1) follow child support orders; (2) contact the DCS case worker and schedule visits with the children; (3) transport himself and be on time to these meetings, and additionally notify the case manager twenty-four hours prior to the scheduled visit if there is a need to cancel; (4) interact with the child in an age-appropriate manner; (5) demonstrate an ability to maintain financial security, appropriate housing, and sobriety; (6) submit to random drug screens; (7) complete an A&D and mental health assessment and follow the recommendations of these assessments; (8) take medications as prescribed; (9) refrain from being charged with any new offenses and follow all court orders regarding previous criminal charges; (10) complete parenting classes and demonstrate appropriate parenting skills; and (11) complete anger management classes and demonstrate better management of his anger.

As an initial matter, there can be no dispute that the requirements of the plans were reasonably related to the conditions that necessitated removal of the children. The children were removed from the home due to Mother and Father's drug use, drug

paraphernalia present in the home, and environmental neglect. Clearly, the requirements of the plans related directly to these issues.

We likewise conclude that Father failed to substantially comply with the requirements of the plans. To meet its burden, DCS must show that the parental noncompliance was substantial, which is measured by "the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Therefore, "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted).

In his brief, Father argues that the State failed to prove this ground by clear and convincing evidence because "complete compliance with a permanency plan is not required to overcome a termination of parental rights case." Father asserts that substantial compliance is met where he (1) completed parenting classes, a relapse prevention program, and anger management classes; (2) has had a mental health assessment; and (3) will have stable housing and $2,000 in savings from his employment during incarceration when he is released. Respectfully, we disagree.

As outlined in more detail above, Father's responsibilities under the permanency plan included (1) providing and maintaining suitable housing; (2) refraining from illegal activity; (3) completing an A&D assessment and following recommendations; (4) completing a mental health assessment and following recommendations; (5) taking medication as prescribed; and (6) completing parenting and anger management classes. As discussed in more detail *supra*, Father has yet to provide or maintain suitable housing for children or refrain from illegal activity as evidenced from his incarceration at the time of the trial. Although Father asserts that he anticipates the ability to provide stable housing after his release, the simple fact is that despite the over two years the children had been in DCS custody, Father had made little effort and no progress in securing stable housing prior to his incarceration. Thus, when Father had the ability to take action to meet the requirements of the plan, he simply chose not to do so. Moreover, Father's incarceration, which is a "self-created legal problem[,] . . . should not create a legal basis for failure to comply with the requirements of a permanency plan." *In re Leland C.L.*, No. E2012-00031-COA-RT-PT, 2012 WL 6562158, at *8 (Tenn. Ct. App. 2012). Only now at the eleventh hour has Father made unsubstantiated promises that he will take action in the future to secure a home for the children. *See In re Aayden L.B.*, No. M2013-00571-COA-R3-PT, 2013 WL 3964781, at *3 (Tenn. Ct. App. July 30, 2013) (holding that "vague promises not supported by actions" were insufficient to show a change in a parent's living situation). Additionally, respectfully, Father's promises for the future cannot undo his failure to take action to secure housing prior to his incarceration or the fact that his actions led him to being incarcerated and therefore unable to care for his children.

Father additionally argues that regardless of his lack of housing, he has taken action to complete several of the requirements of the plan including participating in an A&D assessment, a relapse prevention course, parenting classes, and anger management classes. However, as an initial matter, we note that Father did not complete, nor attempt to complete, any of the requirements in the permanency plans until after he was incarcerated and approximately thirteen months after children were removed from his custody. As pointed out by the trial court in its final termination order, "Father failed to demonstrate willingness, prior to incarceration, to voluntarily make a change."

We additionally note that while Father has now completed some of the requirements of the plans, as noted above, many of the central requirements remain outstanding. For example, despite the drug use that led to the children's removal, Father has failed to participate in an A&D assessment, has failed to successfully complete a substance abuse program as was recommended by Father's mental health assessment,[7] has failed to obtain a stable home for the children, and has failed to refrain from illegal activity; these requirements are integral to the successful reunification of this family. *See In re M.J.B.*, 140 S.W.3d at 656 (noting that a "parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met."); *see also In re Destiny S.*, No. M2016-00098-COA-R3-PT, 2016 WL 4186731, at *9 (Tenn. Ct. App. Aug. 4, 2016) (affirming the ground of substantial noncompliance where the parent completed some tasks but failed to complete the tasks related to sobriety, the "primary concern in this case from the very beginning"). Given Father's failure to take action to complete any of the requirements of the plan in the first two years after the removal of the children and Father's failure to complete the central requirements of the plans, we must conclude that Father's steps towards compliance were "[t]oo little, too late." *In re A.W.*, 114 S.W.3d 541, 546–47 (Tenn. Ct. App. 2003) (noting that although mother had made a "dramatic improvement[,]" her improvement came "[t]oo little, too late."). Therefore, we conclude that from the totality of the circumstances, that there is clear and convincing evidence to support this ground for termination of parental rights.

Persistence of Conditions

Lastly, DCS alleged that Father's parental rights should be terminated because conditions persisted that prevented the children from returning to Father's home. Courts may terminate a parent's rights if it finds, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

---

[7] As previously discussed, one of the requirements of the plan was not only to complete a mental health assessment, but also to follow all recommendations.

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36–1–113(g)(3). The purpose behind this ground is "to prevent the child[ren]'s lingering in the uncertain status of foster child[ren] if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child[ren]." *In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *11 (Tenn. Ct. App. May 5, 2017), *perm. app. denied* (Tenn. July 31, 2017) (citations omitted). "A parent's continued inability to provide fundamental care to a child, even if not willful . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)).

To begin, it is undisputed that the children have been removed from Father's care for over six months and were eventually adjudicated dependent and neglected. *See* Tenn. Code Ann. § 36-1-113(g)(3). In this case, the children were removed from Father's home due to drug use, drug paraphernalia located in the home, and environmental neglect. Father also has a history of incarceration. The trial court found that "conditions which led to the removal of the children from the home still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect." The trial court additionally found that there is little likelihood that the conditions would be remedied at an early date and that the children continuing a relationship with Father greatly diminished the children's chance of an early integration into a stable home. We agree.

Father asserts, however, that the State failed to meet its burden of proof regarding this ground because "there was no proof disputing that [Father] had not satisfactorily resolved his drug problem [or] lined up suitable employment and housing." He further argues that "the facts show[] that he had saved money and had substantial employment available upon his release." We do not find this argument persuasive.

- 15 -

First, Father claims that there was no evidence that contradicted Father's claims that he had resolved his drug problem. Indeed, the record indicates that Father did complete a relapse prevention program. However, Father's assertion of being drug-free and his completion of a relapse prevention program while in prison is undermined by the fact that Father was incarcerated at the time of the trial and at the time he completed the program; therefore, the cessation of his drug use does not appear entirely voluntary and may resume once Father is released from prison. *See In re Travis H.*, 2017 WL 1843211, at *8 ("Father's clean drug screen at trial is of little relevance, as he was incarcerated at the time the drug screen was performed and admitted to using illegal drugs well after the removal of the children."); *In re Navada N.*, 498 S.W.3d at 606 (noting that a parent's cessation of drug use while incarcerated is not sufficient to show to that parent had resolved their drug problem). In fact, the record shows that Father has previously attended two drug rehabilitation programs: one he completed, yet subsequently relapsed, and another he failed to complete after an incident with one of the staff members. Father also testified that he continued using drugs after the children were removed from his custody and up until he became incarcerated. Considering the totality of the circumstances surrounding Father's drug use, we cannot conclude that the steps Father has taken during his current incarceration has resolved his drug problem so as to allow the children to return to his care at this time.

Father also notes his anticipation of suitable employment and stable housing after his release. This Court generally considers circumstances up to the date of trial in determining whether the ground has been met. *See, e.g.*, *In re Mya E.*, No. M2012-02323-COA-R3-PT, 2013 WL 2106839, at *8 (Tenn. Ct. App. May 13, 2013) (considering whether unsafe conditions had been remedied "by trial"); *In re E.M.S.*, No. M2009-00267-COA-R3-PT, 2009 WL 2707399, at *4 (Tenn. Ct. App. Aug. 27, 2009) (affirming the trial court's finding that the conditions had not been remedied by the trial date). In at least one case, this Court recognized that although the father expected to maintain a stable home for his children after being released, at the time of trial, the father was unable to provide a suitable home for the children because he was currently incarcerated. *In re Travis H.*, 2017 WL 1843211, at *12 ("[R]egardless of Father's testimony concerning his anticipated housing upon his release from incarceration, there can be no dispute that [f]ather was unable to provide a home for the child at the time of trial because he remained incarcerated."). Similarly, Father was unable to provide suitable housing for the children at the time of the trial because he, too, was incarcerated. It is also worth noting, as discussed in more detail above, that Father was unable to maintain suitable or stable housing after the children were removed from his custody and up until the time he became incarcerated. Thus, even though Father claims that he anticipates stable housing after his release, this Court cannot say that Father has remedied his housing situation to allow the children to return to his custody because (1) he could not provide suitable and stable housing at the time of trial due to his incarceration and (2) could not provide suitable or stable housing at any point since the children were removed.

Lastly, Father did not dispute his lengthy criminal history and incarceration record, which caused him to be in and out of prison during the entirety of his children's lives and at the time of trial. Thus, instead of remedying any of the situations which led to the children's removal, Father further exacerbated the conditions which led to the children's removal by engaging in further criminal conduct; Father's actions rendered his situation even less compatible with reunification in the near future.

"In parental rights matters, the court does not look to the protestations of affections and expressed intentions of the parent, but rather the parent's course of conduct." *State, Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005). The evidence at trial established that Father had ongoing issues with maintaining a stable home, resolving his drug problems, and refraining from illegal activities that were not likely to be remedied in the near future. These issues prevent the safe return of the children to Father's home at the time of trial and in the foreseeable future. The trial court's determination regarding persistent conditions is therefore affirmed.

Best Interest

When the court finds that at least one ground for termination has been established, the court must then consider whether the termination of parental rights is in the best interest of the child. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent is found to be unfit, through establishment of at least one ground for termination, then the interests of the parent and child diverge and the focus shifts to a determination of the best interest of the child. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee's statutes regarding parental termination recognize that terminating an unfit parent's rights may not always be in the best interest of the child. *Id.* However, when the parent's and child's interest do conflict, courts must resolve the issue in favor of the child. Tenn. Code Ann. § 36-1-101(d). Additionally, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee General Assembly has codified certain factors for courts to consider in their determination of whether termination is in a child's best interest. The factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such

duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court, however, does not have to "find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of the child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Therefore, depending on the circumstances surrounding each case, consideration of just one factor, or a factor not listed in the statute, may dictate the outcome in a trial court's best interest determination. *In re Audrey S.*, 182 S.W.3d at 877. This Court has explained:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a

determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Id.* (citing ***Moody***, 171 S.W.3d at 194).

In this case, the trial court made detailed findings of fact and conclusions of law in support of its decision that termination of Father's rights was in the best interest of the children. We also conclude that the above enumerated statutory factors establish that termination of Father's parental rights is in the children's best interest.

The record indicates that Father did not, in any way prior to his current incarceration, attempt to make any adjustment in his conduct as to make it safe and in the children's best interest to be in his home. *See* Tenn. Code Ann. §36-1-113(i)(1). Indeed, Father testified that he did not have stable housing at any point after the children were removed from his home, and he continued engaging in criminal activity which ultimately resulted in his incarceration. Thus, as we view it, Father continued to make decisions which prevent him from being able to parent the children. Further, Father has failed to maintain regular visitation with the children, as he has not seen them in over a year at the time of trial. *See* Tenn. Code Ann. § 36-1-113(i)(3). Additionally, prior to his incarceration, Father continued to abuse drugs and was unable to maintain stable housing, even following the removal of the children. At the time of trial of course, Father was unable to provide any home for the children due to his incarceration. Thus, the proof shows that Father simply has no healthy and safe home for the children to return. *See* Tenn. Code Ann. § 36-1-113(i)(8).

Most importantly, the testimony at trial illustrates that a change in caretakers at this time is likely to have a significant effect on the children's emotional, psychological, and medical condition. *See* Tenn. Code Ann. §36-1-113(i)(5). The children had been in the care of the foster family for approximately nine months at the time of trial, which family wishes to adopt the children. The children have established a strong bond with the foster family and made great progress since being in the foster family's care. In contrast, the proof indicates that the children have no meaningful relationship with Father, as they either do not ask about him or indicate a desire not to return to Father's care and instead refer to Foster Parents as their "Mom" and "Dad." *See* Tenn. Code Ann. §36-1-113(i)(4).

Thus, given the children's progression and attachment to their pre-adoptive family and Father's ongoing problems with substance abuse, criminal conduct, and maintaining stable housing, we conclude that it would be in the children's best interest to terminate Father's parental rights. The trial court's best interest determination is therefore affirmed.

## CONCLUSION

The judgment of the Tipton County Juvenile Court is affirmed. The termination of Appellant Anthony O.'s parental rights is affirmed. Costs of this appeal are taxed to Appellant, for which execution may issue if necessary.

 

_____
J. STEVEN STAFFORD, JUDGE